Bryan N. DeMatteo (BD 3557)
bryan@demfirm.com
DEMATTEO LAW, PLLC
830 Third Avenue, 5th Floor
New York, NY 10022
Tel.: (866) 645-4169
Fax: (732) 301-9202

　　　　-and-

Rita C. Chipperson, Esq.
rcc@chippersonlaw.com
CHIPPERSON LAW GROUP, P.C.
163 Madison Avenue
Suite 220-40
Morristown, NJ 07960
Tel: (973) 845-9071
*Attorneys for Plaintiff*
*Zaxcom, Inc.*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

ZAXCOM, INC.,              :
                        :
          Plaintiff,    :
                        :     **Civ. A. No. 1:17-cv-03408-NGG-RER**
         v.         :
                        :
                        :     **FIRST AMENDED COMPLAINT**
LECTROSONICS, INC.,    :     **AND DEMAND FOR TRIAL BY JURY**
                        :
         Defendant.  :
                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiff, Zaxcom, Inc. ("Zaxcom"), for its First Amended Complaint against Defendant

Lectrosonics, Inc. ("Lectrosonics") alleges as follows:

## THE PARTIES

1.      Zaxcom is a corporation organized and existing under the laws of the state of New Jersey with it principal place of business at 230 West Parkway, Unit 9, Pompton Plains, New Jersey.

2.      Upon information and belief, Lectrosonics is a corporation organized and existing under the laws of the state of New Mexico with its principal place of business at 581 Laser Road NE, Rio Rancho, New Mexico.

## JURISDICTION AND VENUE

3.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 1, *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4.      This Court has personal jurisdiction over Lectrosonics because, upon information and belief, Lectrosonics has solicited and conducted business within the state of New York in part through commercial internet websites, knowing that its products will be sold and/or available for sale in this district, thereby availing itself of the privilege of acting in the state of New York.  More specifically, Lectrosonics has sold products and committed infringing acts in this district by offering for sale and selling certain electronic recorders, wireless transmitters and receivers, audio processors, and related accessories, including its Portable Digital Audio Recorder ("PDR") and related accessories, through its distribution channels in this district.  For instance, upon information and belief, Lectrosonics markets and offers the PDR and related accessories for sale in this judicial district and throughout the United States through Amazon.com ("Amazon") and its online website (http://www.lectrosonics.com/US/PDR/product.html).  Screen captures from Amazon showing Lectrosonics products being offered for sale is attached as Exhibit A, and printouts of webpages

2

from http://www.lectrosonics.com showing products, including the PDR and related accessories, being offered for sale is attached as Exhibit B.  Upon information and belief, Lectrosonics has also sold numerous PDRs to distributors located within this judicial district.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1400(b) because, among other things, Lectrosonics is subject to personal jurisdiction in this judicial district, Lectrosonics has regularly conducted business in this judicial district, certain of the acts complained of herein occurred in this judicial district, and Lectrosonics has committed acts of infringement and maintains regular and established places of business within this judicial district in accordance with 28 U.S.C. § 1400.

**Lectrosonics's Northeast Regional Office in New York**

6.      Although the manufacturing headquarters of Lectrosonics is located in Rio Rancho, New Mexico, Lectrosonics does not sell a substantial amount of products directly to end-user customers from New Mexico.

7.      Instead, it is Lectrosonics's business model to employ regional offices to assist with sales in various regional sales territories throughout the United States.

8.      Consistent with this business model, Lectrosonics has and continues to operate since at least 2004 four regional offices in the United States, each associated with and located within one of four different sales territories of the United States: (i) western; (ii) southeastern; (iii) central; and (iv) northeastern territories.

9.      Lectrosonics conducts extensive, permanent, continuous, uninterrupted, and non-transient business activities from each of the four regional offices.

10.      Each regional office is headed by a sales and technical manager employee within the respective territory (or region) to facilitate sales, solicit new business, develop dealer

relationships, expand the roster of authorized dealerships, increase awareness of Lectrosonics and its products, conduct formal and informal training events, and provide technical and other support for its regional distributors and end-user customers.

11.     The four regional offices of Lectrosonics are operated by Lectrosonics as places of business for conducting general sales and business activities consistently in a steady, uniform, orderly and methodical manner over at least the past thirteen (13) years, with the northeast sales office in the Eastern District of New York ("Eastern District") being operated in such a manner consistently and without interruption for the past twenty-one (21) years.

12.     Each sales and technical manager employee is required to devote 100% of his/her working effort full time to Lectrosonics's business and is prohibited from taking employment positions or performing work for other employers while working for Lectrosonics.

13.      In part as an attempt to avoid state sales tax and other tax liability for its extensive, permanent, continuous, uninterrupted, and non-transient business activities in the four sales territories, Lectrosonics forbids its sales and technical manager employees from renting or operating brick and mortar sales offices within each territory on behalf of Lectrosonics.

14.     Instead, it is Lectrosonics's business model to ratify, establish and require sales and technical manager employees to use their residences as Lectrosonics's regional offices, from which to conduct extensive, permanent, continuous, uninterrupted, and non-transient business activities on behalf of the company.

15.     Lectrosonics advertises regional sales and technical manager job positions as permanent and full-time "home office" positions, and each and every sales and technical manager employee since 1996 has operated a Lectrosonics regional office from his/her home.

16.     Lectrosonics also exercises substantial control over the location of its regional

4

offices by requiring sales and technical manager employees to reside within the territories they represent and forbidding them from moving outside these territories.

17.     Each sales and technical manager employee is reimbursed by Lectrosonics for various expenses associated with the use of his/her home and other equipment for operating a respective regional office and conducting sales and other business activities on behalf of Lectrosonics.

18.     For instance, sales and technical manager employees are reimbursed for telephone services, Internet connection services, automobiles (both lease payments and insurance), and office equipment (such as computers, printers, fax machines, storage racks, chairs, furniture, etc.).

19.     According to a job posting by Karl Winkler, Vice President of Sales for Lectrosonics, sales and technical manager employees are also provided with "home office allowance[s]" in connection with the use of their respective residences as regional offices of Lectrosonics.

20.     In 1996, Lectrosonics hired Howard Kaufman as a sales and technical manager employee for the northeast reginal sales territory—a full-time, permanent position that Mr. Kaufman still holds to this day, although Mr. Kaufman recently removed the "sales" responsibility from his business card in direct response to the present litigation and the current issues surrounding Lectrosonics's activities within New York State.

21.     In 1996, Lectrosonics operated its northeast regional office out of Mr. Kaufman's home in Valley Stream, NY.  Approximately one year later, Mr. Kaufman moved to Seaford, NY, after which Lectrosonics operated its northeast regional office out of Mr. Kaufman's home in Seaford, NY.

22.     Lectrosonics has operated its northeast regional office out of Seaford, NY for the

past 20 years permanently, consistently and without interruption, and from the Eastern District for the entire 21-year period Mr. Kaufman has been employed by Lectrosonics.

23.     Mr. Kaufman's responsibilities are many, and he conducts a substantial and wide-range of sales, technical support and other business activities out of Lectrosonics's northeast regional office within the Eastern District.

24.     For instance, within and from the Eastern District throughout the entire 21-year period of his employment, Mr. Kaufman has and continues to (i) solicit new business and conduct other sales activities on behalf of Lectrosonics; (ii) perform technical support and product repair, and other client support services for Lectrosonics's dealers and end-user customers; (iii) promote awareness of Lectrosonics and its products to both dealers and end-user customers; (iv) evaluate potential dealerships and consultants for addition to Lectrosonics's list of authorized dealers; (v) conduct formal and informal training sessions and presentations to instruct and assist both dealerships and end-user customers regarding proper operation and functionality of Lectrosonics's various products; (vi) demonstrate Lectrosonics's products to dealers and potential end-user customers; (vii) perform marketing and sponsorship activities, such as attending trade shows and conventions, mass email marketing of technical literature and updates, and generating of marketing and other literature, such as flyers, for dissemination to dealerships, end-user customers and others; (viii) assist standards-setting bodies with the development of technical standards affecting Lectrosonics's products; (ix) act as a liaison between dealers/customers and upper management for providing feedback to Lectrosonics, including by forwarding technical concerns and features desired by end-user customers; (x) assist customers with installation of Lectrosonics's products; (xi) assist in the development and design of audio applications for end-user customers; (xii) receive and take possession of product returns from dealers and end-user customers, and generally to assist

6

in the process of product returns; and (xiii) replace damaged or inoperable products from customers in the field from inventory maintained at Lectrosonics's northeast sales office.

25.     Lectrosonics operates its northeast regional office out of a specific area of Mr. Kaufman's residence from which Lectrosonics business is conducted.

26.     The area includes a dedicated room and storage area in a garage, within which are kept various equipment used by Mr. Kaufman to discharge his responsibilities, including a computer, printer, scanner, desk, storage units, telephone, equipment rack, hard-drives, test equipment, and a large inventory of various Lectrosonics's products.

27.     The northeast regional office within Mr. Kaufman's Seaford, NY residence is a place of business of Lectrosonics.

28.     Mr. Kaufman, on behalf of Lectrosonics and as a Lectrosonics employee and representative, spent and continues to spend a considerable amount of time conducting a great variety of business directly from the northeast regional office within the Eastern District, including taking and fielding technical support and other calls, sending and responding to emails, generating marketing and presentation materials, studying and learning about new and yet-to-be released Lectrosonics products, generating various reports for upper-management, preparing and configuring test equipment, preparing and handling of product returns and other equipment for shipment to Lectrosonics's New Mexico headquarters, and manufacturing test equipment, such as various cables for use in demonstrations.

29.     Lectrosonics also rents and operates a post office box with an Eastern District address, from which Mr. Kaufman regularly ships and receives products (such as demonstration units and loaner equipment) to and from Lectrosonics's headquarters in New Mexico, as well as to and from end-user customers throughout the northeast territory using the Eastern District

address as a return address.

30.     Lectrosonics also uses the northeast sales office to store a considerable amount and large variety of Lectrosonics product inventory within the Eastern District.

31.     Mr. Kaufman uses this inventory on behalf of Lectrosonics to conduct demonstrations and training and as a source of demonstration units for customers wishing to test equipment prior to purchasing.

32.     On numerous occasions, Lectrosonics loans its inventory to customers for use in commercial (i.e., non-test environment) applications.

33.     Lectrosonics also uses product inventory maintained at the northeast regional office to "swap out" defective and/or damaged customer equipment, sometimes transferring ownership of products directly to customers, and to fill customer orders directly when company stock at Lectrosonics's New Mexico facility is depleted.

34.     Any New York inventory transferred to a customer, either by product swap out or by fulfilling orders, is replenished subsequently from Lectrosonics's New Mexico facility.

35.     Lectrosonics has routinely and repeatedly held out its regional offices as offices of Lectrosonics, Inc for the past approximately 21 years.

36.     Mr. Kaufman, as an employee and representative of Lectrosonics, operates a business phone having a Long Island area code and has recently and repeatedly represented to customers and others in the public that he works out of and maintains a New York office.

37.     Karl Winkler, Vice President of Sales for Lectrosonics, also represented recently to customers and others in the public that Lectrosonics maintains a "New York office," and that Mr. Kaufman works therefrom as a representative of Lectrosonics.

38.     Upon information and belief, Lectrosonics also represented to numerous disparate

and unrelated publications repeatedly over the span of at least nineteen (19) years beginning in 1996, including the Albuquerque Journal, Pro-Sound Network, and the Rio Rancho Observer, that Lectrosonics maintains "offices" at various different locations that coincide precisely with the locations of residences of Lectrosonics's sales and technical manager employees, including the location of Mr. Kaufman's Seaford, NY residence within the Eastern District.

39.     One such publication, the Albuquerque Journal, stated expressly in an article that information concerning the locations of Lectrosonics's regional offices, including that Lectrosonics maintains offices in New York, was obtained directly from Lectrosonics itself.

40.     Due in part to Lectrosonics's substantial business activities within New York and its other sales territories, Lectrosonics has been targeted for audits repeatedly by State tax authorities concerned that Lectrosonics's activities within their States are so significant and pervasive that Lectrosonics should be required to pay additional corporate sales tax.  According to Gordon Moore, President of Lectrosonics, "[Lectrosonics is] under scrutiny on a regular basis."

41.     Lectrosonics has twice been audited by the New York State Department of Taxation—at least the first audit being triggered by Mr. Kaufman's business activities within the Eastern District.  Upon information and belief, on both occasions, Lectrosonics was assessed additional sales and use tax for its extensive, permanent, continuous, uninterrupted, and non-transient business activities within the State of New York.

### Jaycee Communications, Inc.

42.     Lectrosonics has a factory authorized service center located in the Eastern District, which has operated since at least 2008 through the joint efforts of Lectrosonics and its agents, Jaycee Communications, Inc. ("Jaycee") and Jerry Cudmore ("Cudmore").

43.     Jaycee and Cudmore are agents of Lectrosonics who have engaged and continue to

engage since at least 2008 in purposeful service and service sales activities in the Eastern District for the benefit of and with the knowledge and consent of Lectrosonics, and Lectrosonics has exercised, and continues to exercise, control over Jaycee and Cudmore in the performance of these activities.

44.     Jaycee, the sole U.S. factory authorized service center of Lectrosonics listed on its website other than Lectrosonics itself, has operated from and continues to operate from the home of Cudmore located at 53-45 210 Street, Oakland Gardens, NY 11364 (the "Oakland Gardens Location") continuously since at least as early as August 2008.

45.     Jaycee and Cudmore have operated the Oakland Gardens Location as a place of business of Lectrosonics for conducting repair service and other business activities consistently in a steady, uniform, orderly and methodical manner, without interruption, for over at least the past nine (9) years.

46.     The repair facility located at the Oakland Gardens Location is a place of business of Lectrosonics.

47.     Lectrosonics exerts control over the manner in which Jaycee and Cudmore perform their work, and the method by which Jaycee and/or Cudmore is/are compensated for such work.

48.     Approximately ninety-eight percent (98%) of Jaycee's and/or Cudmore's revenues are earned from services rendered in connection with the repair of Lectrosonics's products.  The remaining two percent (2%) of revenues are derived from consulting work.

49.     With the authorization of Lectrosonics, Jaycee and/or Cudmore trade on the goodwill of Lectrosonics via the inclusion of "Lectrosonics®" (U.S. Trademark Registration Nos. 2172504 and 2154767, both registered to Lectrosonics) and the Lectrosonics's logo (U.S. Trademark Registration No. 3682198 registered to Lectrosonics) (collectively, the "Lectrosonics's

Marks") on Cudmore's business card without an accompanying attribution statement.

50.     With the authorization of Lectrosonics, Cudmore utilizes one or more of the Lectrosonics logo, "www.lectrorepair.com," and an email address of jerry@lectrorepair.com on his business card since at least as early as 2013 or 2014 without any attribution statement indicating the ownership of these trademarks.

51.     Lectrosonics provided Jaycee and/or Cudmore with artwork for the Lectrosonics's Marks for the purpose of adding the Lectrosonics's Marks to Cudmore's business card.

52.     Jaycee and Cudmore do not have any registered trademarks, and Cudmore's business cards do not currently include any trademarks registered to Jaycee or Cudmore.

53.     Cudmore    holds    himself    out    as    the    President    of    Jaycee Communications/Lectrorepair.com since 2008.

54.     Lectrosonics provided one week of factory training to Jaycee and/or Cudmore.

55.     Jaycee and/or Cudmore purchase parts and other materials from Lectrosonics and/or Lectrosonics suppliers.

56.     Lectrosonics, through its agents Jaycee and Cudmore, have conducted within the Eastern District extensive, permanent, continuous, uninterrupted, and non-transient business activities on behalf of Lectrosonics since at least as early as August 2008.

57.     Jaycee and Cudmore have consented to act on behalf of, and continue to act on behalf of, Lectrosonics and subject to the direction and control of Lectrosonics.

58.     Lectrosonics requires Jaycee and/or Cudmore to conform to various performance standards including, without limitation, presenting "the appearance of a professional, neat repair center to customers."

59.     Lectrosonics controls the timeline for Jaycee and/or Cudmore to render repairs of

Lectrosonics products, as well as the types of Lectrosonics products that may be repaired by Jaycee and/or Cudmore.

60.     With the authorization of Lectrosonics, Cudmore registered and Cudmore and Jaycee utilize the domain name "lectrorepair.com" including the "lectrorepair.com" domain name including, without limitation, jerry@lectrorepair.com.   Lectrosonics lists www.lectrorepair.com on its website as well as a link to the email address of jerry@lectrorepair.com.

61.     Jaycee's and Lectrosonics's warranty and non-warranty repair policies are substantially identical and are worded in a nearly identical manner, with the exception that the non-warranty repair policies have a different diagnostic and handling charge.

62.     Jaycee's and Lectrosonics's warranty and non-warranty repair policies both require obtaining an RO number prior to submitting a product for repair.

63.     Lectrosonics controls and dictates the flat rate labor fee to be paid to Jaycee by Lectrosonics for performance of warranty repair work.

64.     Lectrosonics controls and sets a minimum and maximum charge for non-warranty repairs.

65.     Lectrosonics controls Jaycee's and Cudmore's handling of Lectrosonics's customers via, at a minimum, weekly telephone calls between Lectrosonics's president, Gordon Moore, and Cudmore regarding how Cudmore and/or Jaycee should handle customers.

66.     Cudmore attends trade shows including, without limitation, the National Association of Broadcasters ("NAB") and Audio Engineering Society ("AES") trade shows on behalf of Lectrosonics and from within Lectrosonics's booths, and during at least one such event, he provided customers with a business card bearing at least one registered Lectrosonics trademark.

67.     Lectrosonics sets factory guidelines and factory procedures for repair of

Lectrosonics products including, without limitation, alignment procedures, which are followed by Jaycee and Cudmore.

68.     When Jaycee or Cudmore are confronted with a problem repair, Lectrosonics provides direction regarding how to repair the product.

69.     Jaycee's and/or Cudmore's relationship with Lectrosonics goes beyond the relationship of a standard authorized repair center.  As Cudmore testified during deposition, "authorized to do what [Jaycee and/or Cudmore] do is different than someone who just is authorized repair."

70.     Lectrosonics selected, controls, and pays the fees for Jaycee's and/or Cudmore's legal representation in these proceedings.

71.     Lectrosonics has provided Jaycee with the authority to act on its behalf in determining whether product repairs are no-cost in warranty repairs or out of warranty repairs.

72.     Lectrosonics has granted Jaycee sole authority to service its 185, 190, and 195 series of products, and these products are no longer serviced by the Lectrosonics's factory.

### ZAXCOM'S BUSINESS AND PATENTS

73.     Zaxcom is a leading designer and manufacturer of professional audio equipment for the television and film industries and an Emmy award winner for outstanding achievement in Engineering Development. As a result of its development and promotional efforts, Zaxcom's audio equipment is sought after by consumers, especially consumers in the television and film industries. Aside from current infringement of Zaxcom's patents, Zaxcom is currently the sole supplier to the television and film industries for recording systems that allow for local recording of locally generated audio data that can be combined with remotely recorded audio data of the locally generated audio data for use in post-recording engineering.

74.     On April 19, 2011, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 7,929,902 ("the '902 patent") entitled "VIRTUAL WIRELESS MULTITRACK RECORDING SYSTEM."  A true and correct copy of the '902 patent is attached hereto as Exhibit C.

75.     On February 26, 2013, the USPTO duly and legally issued U.S. Patent No. 8,385,814 ("the '814 patent") entitled "VIRTUAL WIRELESS MULTITRACK RECORDING SYSTEM."  A true and correct copy of the '814 patent is attached hereto as Exhibit D.

76.     On May 10, 2016, the USPTO duly and legally issued U.S. Patent No. 9,336,307 ("the '307 patent") entitled "VIRTUAL WIRELESS MULTITRACK RECORDING SYSTEM." A true and correct copy of the '307 patent is attached hereto as Exhibit E.

77.     Each of the '902 patent, the '814 patent, and the '307 patent (collectively, the "Patents-In-Suit") is valid and legally enforceable.

78.     Zaxcom is the sole and exclusive owner of all rights, title and interest in the Patents-In-Suit, and holds the exclusive right to take all actions necessary to enforce its rights in the Patents-In-Suit, including the filing of this patent infringement lawsuit.  Zaxcom also has the right to recover all damages for past, present, and future infringement of the Patents-In-Suit and to seek injunctive relief as appropriate under the law.

## FACTUAL ALLEGATIONS

79.     The Patents-In-Suit are directed generally to systems and methods for wireless recording of multi-track audio files without the data corruption or loss of data that typically occurs with wireless data transmission.

80.     Lectrosonics manufactures, promotes and sells throughout the United States and the world wireless microphone systems and audio processing products, including its PDR product

14

and related accessories.   Upon information and belief, Lectrosonics markets such products, and specifically the PDR and related accessories, to directly compete with Zaxcom's products, including but not limited to, Zaxcom's TRX series transmitter products.

81.   The PDR is a local audio device that is wearable by a creator of locally generated audio.  The PDR includes, among other things, a time code sync port (i.e., a local audio device receiver), an audio input (i.e., an audio input port), a microSD card (i.e., a memory), a clock (i.e., a timecode generator) and a processing unit for creating stamped local audio data in the form of .wav files (i.e., a control unit electrically coupled to the local audio device receiver, audio input port, and memory).  The locally recorded data is capable of being retrieved and combined with locally generated audio that is remotely recorded.  Upon information and belief, the PDR also allows a user to assign a unique alpha numeric identifier/name to file names of every recording file created by the PDR.

82.   Notwithstanding Zaxcom's rights, Lectrosonics, without permission or authorization, has infringed and continues to infringe one or more claims of the Patents-In-Suit at least by (i) manufacturing, offering for sale, and selling, and/or (ii) knowingly and actively contributing to and/or inducing the infringement of others by using, selling, and/or offering for sale certain electronic audio equipment, including the PDR and related accessories.

83.   At least as early as December 23, 2013, Lectrosonics had actual notice of the '902 patent and the '814 patent by way of a notice letter dated December 23, 2013 ("December 23 Letter") from Zaxcom.  Lectrosonics had actual notice of the '307 patent at least as early as March 20, 2017 by way of a notice letter dated March 20, 2017 ("March 20 Letter") from Chipperson Law Group, P.C.

**COUNT I – PATENT INFRINGEMENT**
**(Direct and Induced Infringement of the '307 Patent)**

84.     Zaxcom repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

85.     Zaxcom has not licensed or otherwise authorized Lectrosonics to make, use, offer for sale, sell, or import any products that embody the inventions of the '307 patent.

86.     Lectrosonics has and continues to directly infringe the '307 patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products, such as the PDR and related accessories (e.g., the MC70 cable accessory), that satisfy each and every limitation of one or more claims of the '307 patent, including at least claims 1-10.  A preliminary claim chart showing how the PDR and related accessories meet the limitations of claims 1-10 is attached hereto as Exhibit F, as well as various exhibits referred to in the chart, including Exhibit H (Gotham PDR Demo), Exhibit K (PDR Data Sheet), Exhibit L (PDR Manual), Exhibit M (MC70 Cable Page), and Exhibit N (BWF Standard).

87.     Lectrosonics has and continues to indirectly infringe one or more claims of the '307 patent in violation of 35 U.S.C. § 271, including claims 12-14, for example, by knowingly and intentionally inducing others to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology, such as the PDR and related accessories, and other activities, such as evidenced from an interview with Karl Winkler, Vice President of Sales For Lectrosonics, on YouTube (https://www.youtube.com/watch?v=5XRoFd6-qcg&sns=em), posted by Matt Price Soundrolling, instructing customers on how to connect the PDR to a Lectrosonics Super Miniature Variable Power Transmitter ("SMV") via a Lectrosonics MC70 audio cable

16

designed to deliver a line level audio signal from an audio source to a Lectrosonics' transmitter. Screen captures of the online YouTube video are attached as Exhibit G. Another video on YouTube posted by Gotham Sound (https://www.youtube.com/watch?v=F1x1mQgxY8k) further teaches customers how to connect a Lectrosonics lavalier microphone to the PDR for use in locally receiving local audio data by at least one performer during an audio event. Screen captures of the online YouTube video are attached as Exhibit H.

88.     Lectrosonics had knowledge that the PDR and related accessories infringe the '307 patent via the March 20, 2017 Letter, and in no event later than April 25, 2017—the date *Zaxcom, Inc. v. Lectrosonics, Inc.*, No. 2:17-cv-02840 (D.N.J. April 25, 2017) was filed in the United States District Court for the District of New Jersey ("the New Jersey Action").

89.     Lectrosonics induced infringement by others, including end users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end users, would infringe the '307 patent, but while remaining willfully blind to the infringement.

90.     Zaxcom has suffered damages as a result of Lectrosonics' infringement of the '307 patent in an amount to be proved at trial.

91.     Zaxcom has suffered, and will continue to suffer, irreparable harm as a result of Lectrosonics' infringement of the '307 patent, for which there is no adequate remedy at law, unless Lectrosonics' infringement is enjoined by this Court.

92.     Upon information and belief, Lectrosonics' infringement of the '307 patent has been willful pursuant to 35 U.S.C. § 284.

## COUNT II – PATENT INFRINGEMENT
### (Induced and Contributory Infringement of the '814 Patent)

93.     Zaxcom repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

94.     Zaxcom has not licensed or otherwise authorized Lectrosonics to make, use, offer for sale, sell, or import any products that embody the inventions of the '814 patent.

95.     Lectrosonics has and continues to indirectly infringe one or more claims of the '814 patent in violation of 35 U.S.C. § 271, including claims 1, 2, 9-10, 15, 31, 36-37, and 41-45, for example, by knowingly and intentionally inducing others to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology, such as the PDR and related accessories, and by promoting and selling the PDR and related accessories with instructions for combination and use by end users in a manner that infringes the '814 patent.  For instance, a video on YouTube, presumably based on instructions provided by Lectrosonics, teaches customers how to connect the PDR to a time code source for the purpose of allowing the PDR to receive a time code.  *See* Exhibit H.  A preliminary claim chart showing how the PDR and related accessories meet the limitations of claims 1, 2, 9-10, 15, 31, 36-37, and 41-45 of the '814 patent is attached hereto as Exhibit I, as well as various exhibits referred to in the chart, including Exhibit B (Lectrosonics Web Pages), Exhibit H (Gotham PDR Demo); Exhibit K (PDR Data Sheet), Exhibit L (PDR Manual), and Exhibit M (MC70 Cable Page).

96.     Lectrosonics has and continues to knowingly contribute to the infringement of one or more claims of the '814 patent in violation of 35 U.S.C. § 271, including claims 1, 2, 9-10, 15, 31, 36-37, and 41-45, for example, by making, using, offering to sell, selling, and/or importing into the United States products, such as the PDR and related accessories (e.g., the MC70 cable

18

accessory), that are not staple articles of commerce with substantial non-infringing uses.  For instance, the PDR is a material component of a system that infringes the '814 patent and includes a time code sync port, the sole purpose of which is to connect to a timecode generator in an infringing manner.

97.    Lectrosonics had knowledge that the PDR and related accessories, or the use thereof, infringe the '814 patent at least as of the date of the December 23 Letter and/or the March 20 Letter, and in no event later than the date the New Jersey Action was filed.

98.    Lectrosonics induced and contributed to the infringement of others, including end users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end users, would infringe the '814 patent, but while remaining willfully blind to the infringement.

99.    Zaxcom has suffered damages as a result of Lectrosonics' infringement of the '814 patent in an amount to be proved at trial.

100.    Zaxcom has suffered, and will continue to suffer, irreparable harm as a result of Lectrosonics' infringement of the '814 patent, for which there is no adequate remedy at law, unless Lectrosonics' infringement is enjoined by this Court.

101.    Upon information and belief, Lectrosonics' infringement of the '814 patent has been willful pursuant to 35 U.S.C. § 284.

## COUNT III – PATENT INFRINGEMENT
### (Induced Infringement of the '902 Patent)

102.    Zaxcom repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

103.    Zaxcom has not licensed or otherwise authorized Lectrosonics to make, use, offer for sale, sell, or import any products that embody the inventions of the '902 patent.

19

104.   Lectrosonics has and continues to indirectly infringe one or more claims of the '902 patent in violation of 35 U.S.C. § 271, including claims 7, 11 and 12, for example, by knowingly and intentionally inducing others to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology, such as the PDR and related accessories, such as evidenced by a video on YouTube instructing customers on how to connect the PDR to a time code source for purposes of allowing the PDR to receive a time code.  *See* Exhibit H.  A preliminary claim chart showing how the PDR and related accessories meet the limitations of claims 7, 11 and 12 of the '902 patent is attached hereto as Exhibit J, as well as various exhibits referred to in the chart, including Exhibit H (Gotham PDR Demo), Exhibit K (PDR Data Sheet), Exhibit L (PDR Manual), Exhibit M (MC70 Cable Page), and Exhibit O (SMV Instruction Manual).

105.   Lectrosonics had knowledge that the PDR and related accessories, or the use thereof, infringe the '902 patent at least as of the date of the December 23 Letter and/or the March 20 Letter, and in no event later than the date the New Jersey Action was filed.

106.   Lectrosonics induced infringement by others, including end users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end users, infringe the '902 patent, but while remaining willfully blind to the infringement.

107.   Zaxcom has suffered damages as a result of Lectrosonics' infringement of the '902 patent in an amount to be proved at trial.

108.   Zaxcom has suffered, and will continue to suffer, irreparable harm as a result of Lectrosonics' infringement of the '902 patent, for which there is no adequate remedy at law, unless Lectrosonics' infringement is enjoined by this Court.

109.     Upon information and belief, Lectrosonics' infringement of the '902 patent has been willful pursuant to 35 U.S.C. § 284.

## PRAYER FOR RELIEF

WHEREFORE, Zaxcom prays for the following relief against Lectrosonics:

A.      A judgment that Lectrosonics has directly and/or indirectly infringed one or more claims of each of the Patents-In-Suit;

B.      An order pursuant to 35 U.S.C. § 283 permanently enjoining Lectrosonics and each of its affiliates, officers, agents, servants, and employees and all persons in active concert or participation with it from further acts of infringement of the Patents-In-Suit;

C.      An order that Lectrosonics deliver to this Court for destruction all products that infringe, directly or otherwise, or the use of which would infringe, directly or otherwise, any claim of the Patents-In-Suit;

D.      An order awarding damages sufficient to compensate Zaxcom for Lectrosonics' infringement of the Patents-In-Suit, but in no event less than a reasonable royalty, together with interest and costs;

E.      A judgment that Lectrosonics' infringement has been willful pursuant to 35 U.S.C. § 284 and an order awarding enhanced damages, in an amount to be proven at the time of trial;

F.      A judgment declaring that this case is exceptional and awarding Zaxcom its costs and reasonable attorney fees under 35 U.S.C. § 285; and

G.      Such other and further relief as the Court may deem equitable and proper.

## DEMAND FOR JURY TRIAL

Zaxcom demands trial by jury on all issues so triable.

Dated: November 16, 2017

*/s/ Bryan N. DeMatteo*
Bryan N. DeMatteo (BD 3557)
bryan@demfirm.com
DEMATTEO LAW, PLLC
830 Third Avenue, 5th Floor
New York, NY 10022
Tel.: (866) 645-4169
Fax: (732) 301-9202

-and-

Rita C. Chipperson, Esq.
rcc@chippersonlaw.com
CHIPPERSON LAW GROUP, P.C.
163 Madison Avenue
Suite 220-40
Morristown, NJ 07960
Tel: (973) 845-9071
*Attorneys for Plaintiff*
*Zaxcom, Inc.*