Bryan N. DeMatteo (BD 3557)
bryan@demfirm.com
DEMATTEO LAW, PLLC
830 Third Avenue, 5th Floor
New York, NY 10022
Tel.: (866) 645-4169
Fax: (732) 301-9202

    -and-

Rita C. Chipperson, Esq.
rcc@chippersonlaw.com
CHIPPERSON LAW GROUP, P.C.
163 Madison Avenue
Suite 220-40
Morristown, NJ 07960
Tel: (973) 845-9071
*Attorneys for Plaintiff*
*Zaxcom, Inc.*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZAXCOM, INC., | |
| *Plaintiff*, | Civ. A. No. 1:17-cv-03408-NGG-RER |
| v. | |
| LECTROSONICS, INC., | |
| *Defendant*. | |

## ZAXCOM INC.'S MEMORANDUM OF LAW
## IN OPPOSITION TO LECTROSONICS INC.'S MOTION TO DISMISS
## FOR IMPROPER VENUE, OR IN THE ALTERNATIVE, TO TRANSFER THE CASE
## TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO

**TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................................. 1

II.  STATEMENT OF FACTS ...................................................................................... 5

    A. Lectrosonics's Northeast Regional Office ........................................................ 5

    B. Jaycee Communications Inc. ............................................................................ 12

III. ARGUMENT ....................................................................................................... 14

    A. Legal Standard ................................................................................................. 14

    B. Venue Is Proper In The Eastern District Under 28 U.S.C. § 1400(b) ............ 16

        i.   Lectrosonics Committed Acts Of Alleged Infringement Within The Eastern District ....................................................................................................... 17

        ii.  The Northeast Regional Office And Jaycee Are Physical, Regular And Established Places of Business .......................................................................... 18

        iii. The Northeast Regional Office Is A Place of Business of Lectrosonics ................. 19

        iv.  Jaycee Is A Place of Business of Lectrosonics .......................................... 23

IV.  CONCLUSION .................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**

*3M v. Johnson & Johnson Prods.*,
  1986 U.S. Dist. LEXIS 15763 (D. Minn. 1987) ................................................................. 21

*Brevel Products Corp. v. H & B American Corp.*,
  202 F. Supp. 824 (S.D.N.Y. 1962) ...................................................................................... 23

*Brunswick Corp. v. Suzuki Motor Co.*,
  575 F. Supp. 1412 (E.D. Wis. 1983) ................................................................................... 21

*Chadeloid Chemical Co. v. Chicago Wood Finishing Co.*,
  180 F. 770 (Cir. Ct. N.Y. 1910) .......................................................................................... 24

*Cordis Corp. v. Cardiac Pacemakers*,
  599 F.2d 1085 (1st Cir. 1979) ............................................................................................. 22

*CPG Prods. Corp. v. Mego Corp.*,
  1980 U.S. Dist. LEXIS 17061 (S.D. Ohio 1980) ................................................................ 21

*Endrezze v. Dorr Co.*,
  97 F.2d 46 (9th Cir. 1938) ................................................................................................... 22

*Ginsberg v. Gov't Props. Trust, Inc.*,
  2007 U.S. Dist. LEXIS 75771 (S.D.N.Y. Oct. 11, 2007) ................................................... 14

*In re Cordis Corp.*,
  769 F.2d 733 (Fed. Cir. 1985) ....................................................................................... 15, 16

*In re Cray Inc.*,
  871 F.3d 1355 (Fed. Cir. Sept. 21, 2017) .................................................................... passim

*In re Parmalat Sec. Litig.*,
  594 F. Supp. 2d 444 (S.D.N.Y. 2009) ................................................................................. 24

*In re Tronox, Inc. Secs. Litig.*,
  769 F. Supp. 2d 202 (S.D.N.Y. 2011) ................................................................................. 24

*Instrumentation Specialties Co. v. Water Associates, Inc.*,
  1977 U.S. Dist. LEXIS 13508 (N.D. Ill. 1977) .................................................................. 21

*Jenkins v. Nat'l Grid USA*,
  2017 U.S. Dist. LEXIS 49365 (E.D.N.Y. Mar. 31, 2017) .................................................. 24

*Johnston v. IVAC Corp.*,
  681 F. Supp. 959 (D. Mass. 1987) ...................................................................................... 23

*Knapp-Monarch Co. v. Casco Prods. Corp.,*
   342 F.2d 622 (7th Cir. 1965) ........................................................................ 25

*Mallinckrodt IP v. B. Braun Med. Inc.,*
   2017 U.S. Dist. LEXIS 205593 (D. Del. Dec. 14, 2017)................................ 21

*Mirabadi v. Nurbakhsh,*
   1995 U.S. Dist. LEXIS 13780 (S.D.N.Y. Sept. 22, 1995)............................. 10

*New Moon Shipping Co., Ltd. v. MAN B&W Diesel AG,*
   121 F.3d 24 (2d Cir. 1997)............................................................................ 14

*Nuevo Mundo Holdings v. PriceWaterhouseCoopers LLP,*
   2004 U.S. Dist. LEXIS 780 (S.D.N.Y. Jan. 22, 2004) .................................. 23

*Railex Corp. v. White Mach. Co.,*
   243 F. Supp. 381 (E.D.N.Y. 1965) ............................................................... 23

*Sensonics, Inc. v. Aerosonic Corp.,*
   81 F.3d 1566 (Fed. Cir. 1996)....................................................................... 17

*Shelter-Lite, Inc. v. Reeves Bros., Inc.,*
   356 F. Supp. 189 (N.D. Ohio 1973)......................................................... 16, 22

*Sherman Paper Products Corp. v. Sorg Paper Co.,*
   161 F. Supp. 44 (E.D. Mich. 1958)............................................................... 24

*Stewart-Warner Corp. v. Hunter Engineering Co.,*
   1969 U.S. Dist. LEXIS 10553 (N.D. Ill. July 3, 1969)................................. 25

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC,*
   137 S. Ct. 1514 (2017).................................................................................. 15

*TeeVee Toons, Inc. v. Gerhard Schubert GmbH,*
   2002 U.S. Dist. LEXIS 5546 (S.D.N.Y. Mar. 28, 2002) .............................. 14

*Thomson-Houston Electric Co. v. Bullock Electric Co.,*
   101 F. 587 (Cir. Ct. N.Y. 1900).................................................................... 24

*Univ. of Ill. Found. v. Channel Master Corp.,*
   382 F.2d 514 (7th Cir. 1967) ........................................................................ 22

*W. S. Tyler Co. v. Ludlow-Saylor Wire Co.,*
   236 U.S. 723 (1915)...................................................................................... 22

**Statutes**

28 U.S.C. § 1400(b) ........................................................................................... 1, 15, 21

28 U.S.C. § 1404(a) ..................................................................................................... 1

**Rules**

Fed. R. Civ. P. 12(b)(3) .............................................................................................. 14

Plaintiff, Zaxcom, Inc. ("Plaintiff" or "Zaxcom"), submits this memorandum of law in opposition to Lectrosonics Inc.'s ("Lectrosonics's") Motion to Dismiss for Improper Venue, or in the Alternative, to Transfer the Case to the United States District Court for the District of New Mexico.  Opposing declarations of Glenn Sanders ("Sanders Decl.") and Bryan N. DeMatteo ("DeMatteo Decl."), with accompanying Exhibits A through AD, are submitted herewith.

## I.   INTRODUCTION

After 60 days of jurisdictional discovery (which Lectrosonics opposed vigorously), including production of hundreds of pages of Lectrosonics's documents and depositions of Lectrosonics's president and northeast sales representative, one thing is now crystal clear—venue is properly laid within the Eastern District of New York ("the Eastern District") because Lectrosonics has operated (and continues to operate) "regular and established place[s] of business" here.[1]  Lectrosonics largely ignores this discovery, instead supporting its motion almost entirely with self-serving declarations of its employees and business associates.  This is hardly surprising, as facts uncovered during jurisdictional discovery are simply devastating to Lectrosonics's case, contradicting many of the self-serving statements of Lectrosonics's declarants, not to mention Lectrosonics's patently false representation to this Court in June 2017 that it "has no presence in and does not conduct business in the State of New York."  *See* Dkt. 11.  It is Lectrosonics, not Zaxcom, which has a penchant for "mischaracteriz[ing] facts."  *See* Mot. at 5 n.3.

---

[1] Lectrosonics chose not to seek transfer based on 28 U.S.C. § 1404(a) and, as such, evidence of convenience that courts typically consider when deciding venue-related transfer motions (*e.g.*, choice of forum, location of documents and witnesses, forums' relative familiarity with the law, etc.) are irrelevant.  The only relevant question is whether venue is proper under 28 U.S.C. § 1400(b) ("§ 1400(b)").  Venue is proper if Lectrosonics "committed acts of infringement and has . . . regular and established place[s] of business" in the Eastern District.  *Id*.  As Lectrosonics's motion does not dispute that it committed alleged acts of infringement, the only contested issue is whether Lectrosonics maintains "regular and established place[s] of business" within the Eastern District.  Plaintiff voluntarily dismissed a similar action against Lectrosonics in New Jersey due to an intervening change in law (not relevant in this case) that rendered venue improper in that State.

1

The *real* facts uncovered during discovery are these.  New York is one of the most important markets for Lectrosonics, representing in 2017 approximately 40% of Lectrosonics's U.S. sales.  To service customers in New York and surrounding states (including 13 dealers within the Eastern District alone), Lectrosonics operates a northeast regional business office from within the Eastern District and has done so continuously and without interruption for the past 21 years. Howard Kaufman, a full-time sales and technical representative of Lectrosonics and operator of the northeast office for more than two decades, runs the office from a dedicated portion of his home, within which is kept various office and business equipment, as well as an inventory of approximately 100 Lectrosonics products (worth tens of thousands of dollars) tasked by the company for a variety of purposes, including demonstrations, product swaps and direct fulfillment of sales.  Mr. Kaufman performs what he calls a "great variety" of Lectrosonics business from the northeast regional office, including sales solicitation, technical support, product instruction, product demonstrations, sponsorship activities, customer liaison activities, product installation support, customer system design, and product returns—activities that are so extensive they twice triggered audits by the New York State Department of Taxation, resulting in additional tax liability being assessed against Lectrosonics.  Mr. Kaufman also contracts with a local third-party company for mail support services, and receives reimbursement from Lectrosonics for all business expenses, use of a company car and insurance.  Lectrosonics personnel, including the vice president of sales, have also publicly represented over the past 14 years—and likely longer—that the northeast and other regional offices are official offices of Lectrosonics, and that Mr. Kaufman works from an office in New York as a representative of the company.

Regional managers, such as Mr. Kaufman, do not simply "work as [they] choose from home" with Lectrosonics's permission.  *See* Mot. at 7.  They are strongly encouraged, if not

2

required, to do so as part of an apparent plan by Lectrosonics to utilize the homes of its managers to conduct company business.  Lectrosonics forbids regional managers from opening brick-and-mortar offices, advertises regional manager job positions as full-time "home office" positions, requires the location of a "home office" to be "in [an assigned] territory" and offers "home office allowance[s]" presumably as compensation for use of managers' homes—*facts that are conveniently missing from Lectrosonics's opening brief*.  Lectrosonics also offers reimbursement for office equipment and related services (such as computers, printers, furniture, land-line Internet services, etc.), none of which could be utilized reasonably from any location other than a home office given the company's policy against brick-and-mortar sites.  Mr. Kaufman himself testified that, at the time he was hired, he understood that official business was to be conducted from his home.  Indeed, there is no evidence whatsoever that managers working outside of the company's headquarters in New Mexico operated U.S. regional offices from any location other than from their respective residences at any time over the past 21 years.  Surely, this is no coincidence.

Lectrosonics is flat wrong that venue cannot be supported by operation of a home office.  *See* Mot. at 13-16.  The Federal Circuit in *In re Cray*, which Lectrosonics notes correctly as the authority on patent venue (*see* Mot. at 15-16), states that a home office *can* confer venue.  *See In re Cray Inc.*, 871 F.3d 1355, 1357, 1363-65 (Fed. Cir. Sept. 21, 2017).  This is especially the case where, like here, (i) employees' homes are used to store inventory; (ii) business use of employees' homes is established or ratified by the defendant; (iii) the defendant has a business model whereby "many employees' homes are used by the business as a place of business of the defendant;" (iv) officers and other personnel of the defendant represent publicly that employees' homes are offices of the defendant; (v) the defendant played a role in selecting the location of home offices; and (vi) the defendant offers compensation (*i.e.*, "home office allowance[s]") linked to use of employees'

homes for business. *Id*. Indeed, as is evident from the chart below outlining factors courts typically

consider, this case is far more deserving of a finding of proper venue than *any* of the "home office"

cases cited in the parties' briefing, including six cases finding venue to be proper.

| Factor | ZAXCOM v. LECTRO | In re Cray | In re Cordis | 3M | Brunswick Corp. | CPG Prods. | Instr. Specialities | Shelter-lite | Univ. of Illinois | Johnston | Railex Corp. | Free-Flow Packaging |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee(s) at home office work full-time | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | – | – | – | – | – | ✗ |
| Company establishes or ratifies use of employees' homes for business | ✓ | ✗ | – | – | – | – | – | – | – | – | – | ✗ |
| Evidence of a plan by company to use homes of employees for business | ✓ | ✗ | – | – | – | – | – | – | – | – | – | ✗ |
| Company plays role in selecting office location | ✓ | ✗ | – | – | – | ✗ | – | – | – | – | – | – |
| Portion of home set aside for business use | ✓ | – | – | – | – | – | – | – | – | – | – | – |
| Company represents publicly that home is company office | ✓ | ✓ | – | – | – | ✗ | – | ✓ | ✗ | ✗ | ✓ | ✓ |
| local phone number within district provided to customers | ✓ | ✗ | – | – | – | – | – | – | – | – | – | – |
| Company offers compensation linked to use of employees' homes | ✓ | ✗ | ✗ | ✗ | ✗ | – | – | ✗ | ✗ | ✗ | ✗ | – |
| Company reimburses office and other business expenses | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | – | – | – | ✓ |
| Company maintains inventory/samples at home office | ✓ | ✗ | – | ✓ | ✗ | – | – | – | ✗ | ✗ | ✗ | ✗ |
| Company uses inventory at home office to fill sales orders | ✓ | ✗ | ✓ | ✗ | ✗ | – | – | – | ✗ | ✗ | ✗ | ✗ |
| local service provider hired for support services in connection with home office | ✓ | ✗ | – | – | – | – | – | – | ✓ | ✓ | – | – |
| Company requires employees to be physically present within district | ✓ | ✗ | ✗ | – | ✗ | ✗ | – | – | ✗ | ✓ | – | ✓ |
| Company lists home office on website or affixes name/signage to home | ✗ | – | ✗ | ✓ | – | ✗ | – | – | – | – | – | ✗ |
| Company owns, rents or exercises control over home | ✗ | ✗ | ✗ | – | ✗ | – | – | – | – | – | – | ✗ |
| # of years of continuous operation of home office | 20+ | 7 | – | 9 | – | – | 9 | 6 | – | – | – | 15 |
| Venue held proper? | | No | Yes | Yes | Yes | Yes | Yes | Yes | No | No | No | No |

–   =   Factor Not Mentioned in Court Opinion

Jaycee Communications, Inc. ("Jaycee"), a repair facility within the Eastern District, is also a "regular and established place of business" of Lectrosonics because Jaycee is an agent of the company.   Lectrosonics contracts with Jaycee to provide its east coast customers with an alternative locale for receiving repair services similar in quality to those provided by its factory in New Mexico.   98% of Jaycee's business is devoted to the repair of Lectrosonics products. Lectrosonics controls by contract how these repairs are effectuated, including prices, parts and cost thereof, warranty and repair terms, timing of repairs, return policies, customer interactions, invoicing, reporting, etc.   Jaycee received "extensive factory training" from Lectrosonics, has full access to Lectrosonics's technical support team, follows Lectrosonics's factory guidelines and warranty repair policies, and uses test and alignment equipment approved by Lectrosonics. Jaycee's owner also receives weekly instruction from the president of Lectrosonics, operates a website entitled "LectroRepair.com," displays the Lectrosonics logo on his business cards and website, mans Lectrosonics booths at trade shows, and was reimbursed by Lectrosonics for expenses associated with a deposition in this case.   Lectrosonics's motion should be denied.[2]

## II.   STATEMENT OF FACTS

### A.   Lectrosonics's Northeast Regional Office

While Lectrosonics is headquartered in Rio Rancho, New Mexico, it operates regional offices across the U.S. (each headed by a respective regional manager) to conduct general business and promote sales.   *See* DeMatteo Decl., Ex. A (Moore Dep.) at 21:6-9, 61:21 to 63:3. Lectrosonics established the first regional office in 1996 within the Eastern District.   *Id*., Ex. A at 63:19 to 64:3.   By 2003, territories grew to include western, southeastern, and central U.S. sales territories, each headed by a respective regional office and manager.   *Id*., Ex. B at LEC000165.

---

[2] To the extent the Court holds otherwise, Zaxcom requests that the case be transferred to New Mexico.

The northeast regional office began operations out of Valley Stream, NY, moving to Seaford, NY approximately one year later, where it has been operated from the Eastern District continuously and without interruption for the last 20 years. *Id*., Ex. A (Moore Dep.) at 141:10-14, 144:18-25, 167:25 to 168:25; Ex. D at LEC000469; Ex. E (Kaufman Dep.) at 103:16 to 104:5. Lectrosonics operated the southeastern regional office out of Spring Hill/Nashville, Tennessee from 2003-2016, and thereafter from Austin Texas. *Id*., Ex. A (Moore Dep.) at 67:20 to 68:1. The western regional office began operations out of Sacramento, California in the mid-2000s, moving to Salt Lake City from 2012 through October 2015, and then again to Los Angeles, California in December 2015. *Id*., Ex. A (Moore Dep.) at 64:17 to 65:2, 67:7-19, 75:20-25. Lectrosonics also opened a sales office in Toronto, Canada in February 2006. *Id*., Ex. A (Moore Dep.) at 99:12-16.

In an attempt to avoid state sales tax for its extensive regional business activities (an attempt that ultimately failed—*see below*), Lectrosonics forbids its U.S. regional managers from operating offices out of brick and mortar sites. *Id*., Ex. A (Moore Dep.) at 73:1-11. Instead, it is Lectrosonics's apparent business model to strongly encourage, if not require, its managers to use their residences as regional offices. *Id*., Ex. A (Moore Dep.) at 79:18-24. Karl Winkler, Lectrosonics's Vice President of Sales, who the President of the company, Gordon Moore, testified is the person most knowledgeable about Lectrosonics's requirements for regional sales managers (*see id.*, Ex. A (Moore Dep.) at 76:24 to 77:2), advertises regional manager positions as permanent "home office" positions, with benefits that include "home office allowance[s]" and "vehicle allowance[s]," including lease payments and car insurance. *See Id*., Ex. C; *see also id.*, Ex. A (Moore Dep.) at 78:22 to 79:17, 165:10-23; Ex. D at LEC000468. Regional manager employment contracts also state that Lectrosonics provides (or reimburses for) "office equipment, including computers, furniture, telephone service and other services . . . ." *Id*., Ex. D at LEC000468; Ex. E

(Kaufman Dep.) at 141:2-7.  At the time of his hiring, it was understood by the northeast regional manager in the Eastern District that business activities were to be performed out of his home.  *Id*., Ex. E (Kaufman Dep.) at 140:25 to 141:7.  Lectrosonics also requires regional managers to operate home offices from within their assigned territories and prohibits them from working for other employers or moving to locations where they cannot perform tasks or meet with customers in-person.  *Id*., Ex. A (Moore Dep.) at 69:24 to 70:2, 155:21 to 156:8, 157:20-23, 161:22 to 162:7; Ex. C (job posting requiring "home office" to be "in the territory.").

The northeast regional office within the Eastern District is operated by Howard Kaufman, a full-time regional sales and technical representative who joined Lectrosonics in November 1996.  *Id*., Ex. A (Moore Dep.) at 54:12-21, 139:1-10, 144:18-20, 145:1-3; Ex. D; Ex. E (Kaufman Dep.) at 52:15-19.  At the time of his hiring, Mr. Kaufman was given substantial responsibilities and authorization to conduct a wide range of Lectrosonics business within New York and surrounding states.  According to his 1996 employment contract:

> Mr. Kaufman's primary responsibility is to . . . develop, implement and manage a plan for expanding use and awareness of [Lectrosonics's] products.  This shall include, but is not limited to develop, assess and evaluate consultants, dealers and end users, technical training and coordination with [Lectrosonics's] production, accounting and marketing personnel.  Mr. Kaufman shall be responsible for training and representation of the products in the [northeast] territory defined herein . . . .

*Id*., Ex. D at LEC000467.

Mr. Kaufman performs what he characterizes as a "great variety" of Lectrosonics business at the northeast regional office, including, for example, taking and fielding technical support and other calls, sending and responding to emails, generating marketing and presentation materials, studying and learning about new and yet-to-be released Lectrosonics products, generating various reports for upper-management, preparing and configuring test equipment, preparing and handling

product returns and other equipment for shipment to Lectrosonics's New Mexico headquarters, and manufacturing test equipment, such as various cables for use in demonstrations. *Id.*, Ex. A (Moore Dep.) at 152:8-17, 170:19 to 171:7, 181:22-25; Ex. E (Kaufman Dep.) at 56:9-23, 57:8-14, 90:21 to 91:9, 95:25 to 96:22, 133:18 to 134:25, 136:4-19. Mr. Kaufman also (i) solicits new business from dealers, consultants and end-user customers (*id.*, Ex. A (Moore Dep.) at 147:14-15, 148:11-16, 172:19-22; Ex. E (Kaufman Dep.) at 58:6-18, 84:21 to 85:13); (ii) provides customers with product list and price quotes for various projects (*id.*, Ex. E (Kaufman Dep.) at 76:16 to 78:6, 82:7-15); (iii) performs technical support and other support services for dealers and end-user customers (*id.*, Ex. A (Moore Dep.) at 154:1-3, 172:23 to 173:22, 174:7-9; Ex. E (Kaufman Dep.) at 63:4-15, 91:13-23); (iv) instructs and assists both dealerships and end-user customers regarding proper operation and functionality of Lectrosonics's products (*id.*, Ex. A (Moore Dep.) at 148:20 to 149:19; Ex. E (Kaufman Dep.) at 54:21 to 55:9); (v) demonstrates Lectrosonics's products to dealers and end-user customers, and provides dealers and customers with loaner equipment from inventory maintained at the northeast regional office (*id.*, Ex. A (Moore Dep.) at 179:24-25, 180:7 to 181:16; Ex. E (Kaufman Dep.) at 90:16-20); (vi) performs marketing and sponsorship activities, such as attending trade shows and conventions, emails of technical literature and updates, and generation of marketing and other literature, such as flyers, for dissemination to dealerships, end-user customers and others (*id.*, Ex. A (Moore Dep.) at 152:8-17, 170:19 to 171:7, 181:22-25; Ex. E (Kaufman Dep.) at 56:9-23, 57:8-14, 90:21 to 91:9, 95:25 to 96:22); (vii) assists standards-setting bodies with development of technical standards affecting Lectrosonics's business (*id.*, Ex. E (Kaufman Dep.) at 97:18 to 99:11); (viii) acts as a liaison between dealers/customers and upper management for providing feedback to Lectrosonics concerning issues and features desired by end-user customers (*id.*, Ex. A (Moore Dep.) at 148:11-16, 172:13-15; Ex. E (Kaufman Dep.) at

67:12 to 68:5); (ix) assists customers with installation of Lectrosonics's products (*id.*, Ex. A (Moore Dep.) at 199:25 to 200:6; Ex. E (Kaufman Dep.) at 70:14-18); (x) assists customers with the development and design of various applications employing Lectrosonics's products (*id.*, Ex. E (Kaufman Dep.) at 76:9-13, 88:14 to 89:11); (xi) takes possession of product returns from dealers and end-user customers, and generally assists with returns (*id.*, Ex. A (Moore Dep.) at 175:11-24; Ex. E (Kaufman Dep.) at 91:24 to 92:25); and (xii) replaces damaged or inoperable products of customers from inventory maintained at the northeast regional office (*id.*, Ex. A (Moore Dep.) at 176:23-25; Ex. E (Kaufman Dep.) at 93:1 to 94:5.

Mr. Kaufman operates the northeast regional office out of a specific area of his residence within the Eastern District. *Id.*, Ex. E (Kaufman Dep.) at 104:2-19. The area includes a dedicated room and separate storage area, within which are kept various equipment used by Mr. Kaufman to discharge his responsibilities, including, *e.g.*, a computer, printer/scanner, desk, storage units, equipment racks, hard-drives, speakers, amplifiers, and test equipment. *Id.*, Ex. A (Moore Dep.) at 184:22 to 185:2; Ex. E (Kaufman Dep.) at 104:20 to 106:10, 109:21 to 112:9, 135:23 to 136:11. Lectrosonics also maintains a considerable amount and large variety of Lectrosonics product inventory (approximately 100 separate "finished goods" worth tens of thousands of dollars) at Mr. Kaufman's residence. *Id.*, Ex. A (Moore Dep.) at 182:9 to 183:5; Ex. F (NY Product Inventory) at LEC000622-624. Lectrosonics uses this inventory for a variety of purposes, such as for demonstrations and training, as a source of loaner equipment, and to "swap out" defective customer equipment. *Id.*, Ex. A (Moore Dep.) at 187:3-25, 197:23 to 198:3; Ex. E (Kaufman Dep.) at 93:1-10, 157:6 to 159:12. Mr. Kaufman also uses the inventory to fill customer orders directly when stock at Lectrosonics's New Mexico facility is depleted. *Id.*, Ex. E (Kaufman Dep.) at 159:13 to 160:3. Mr. Kaufman also contracts with a local third-party mail service (UPS) to manage

and operate a post office box within the Eastern District.  *Id.*, Ex. E (Kaufman Dep.) at 114:2 to

115:14.  Mr. Kaufman uses this post office box to ship and receive products to and from

Lectrosonics's headquarters, as well as to and from end-user customers.[3]  *Id.*

Lectrosonics personnel represented to the public on multiple occasions that its regional

office in the Eastern District is an official office of Lectrosonics.  Mr. Kaufman operates a business

phone having a Long Island area code (516) and represented publicly that he works for

Lectrosonics from "an office . . . in New York."  *Id.*, Ex. G at LEC000466; Ex. H at LEC000464;

Ex. I.  Karl Winkler, Lectrosonics's Vice President of Sales, characterized the northeast regional

office as "*our* NY office" to customers and others in the public and represented that Mr. Kaufman

works therefrom as a representative of Lectrosonics.  *Id.*, Ex. J at LEC000453 (emphasis added).

Gordon Moore, President of Lectrosonics, not only admitted during deposition that these

representations were made, but also agreed that "if anybody knows about where Lectrosonics's

regional offices are . . ., it would be [Karl Winkler]."  *Id.*, Ex. A (Moore Dep.) at 133:19 to 134:9.

Lectrosonics also apparently represented to numerous disparate and unrelated publications

over the span of at least 14 years that Lectrosonics operates regional business offices, including

one in the Eastern District.  For instance, 2004 and 2005 articles from the Albuquerque Journal

---

[3] Lectrosonics contends incorrectly that Zaxcom mischaracterizes Mr. Kaufman's activities (such as those relating to the post office box) as activities of Lectrosonics.  *See* Mot. at 8 n.4.  Mr. Kaufman is a 21-year representative of Lectrosonics with substantial authority to conduct a wide range of business activities on behalf of the company.  When Mr. Kaufman contracts for mail services to assist him in performing the very business activities demanded of him by Lectrosonics (or takes any action to further his business responsibilities), he does so as an employee and representative of Lectrosonics with express or tacit authorization—plain and simple.  *Cf. Mirabadi v. Nurbakhsh*, 1995 U.S. Dist. LEXIS 13780, at *5 (S.D.N.Y. Sept. 22, 1995) ("[u]nder the doctrine of respondeat superior, an employer may be held liable for the acts of an employee if such acts are within the scope of employment and in furtherance of the employer's business.").  Lectrosonics cannot unilaterally decide for purposes of its motion which business activities of Mr. Kaufman are those of Lectrosonics and which are those of Mr. Kaufman individually.

represent that Lectrosonics "has offices in New York, California and Tennessee"—locations that match *precisely* with the residence locations of Lectrosonics's northeast, western, and southeastern regional managers during this time period. *Id*., Ex. K at 2; Ex. L at 2. The 2005 article also makes clear that Lectrosonics itself was the "data source" for the article—a fact that Gordon Moore, the President of Lectrosonics, did not deny. *Id*., Ex. A (Moore Dep.) at 101:3-13; Ex. L at 2. A September 9, 2015 article published by www.ProSoundNetwork.com (a publication having no known relationship to the Albuquerque Journal), represents that "Lectrosonics has four regional offices in North America—in New York, Tennessee, Salt Lake City and a sales and service office in Toronto"—locations that, again, match *precisely* with the locations of Lectrosonics's regional managers at the time the article was published. *Id*., Ex. M at LEC000459. A November 2015 article about Lectrosonics from yet another publication (the Rio Rancho Observer) states "Lectrosonics employs about 200 people—150 of them in Rio Rancho—with offices in New York, Nashville, Austin and Toronto"—locations that, once again, match *precisely* with the locations of Lectrosonics's regional managers at the time. *Id*., Ex. N at 3. Mr. Moore testified that he was interviewed personally for at least one of these articles, that it was important to ensure articles about the company were accurate, and he could not deny that Lectrosonics personnel publicly represented to these and other news publications that the company maintains regional business offices throughout the United States. *Id*., Ex. A (Moore Dep.) at 25:5-12, 29:13-17, 91:18 to 92:12, 93:20-24, 101:19-24, 110:8-15, 112:21 to 113:12, 122:10-24.

Lectrosonics has been targeted for audits repeatedly by state tax authorities concerned that Lectrosonics's activities within their states are so significant and pervasive that Lectrosonics should be required to pay additional tax. According to Gordon Moore, "[Lectrosonics is] under scrutiny [from state tax authorities] on a regular basis," particularly in "California, New York, and

Tennessee" where Lectrosonics maintains regional offices.  *Id.*, Ex. A (Moore Dep.) at 215:9; Ex. P at LEC000621.  Lectrosonics has twice been audited by the New York State Department of Taxation based on Mr. Kaufman's business activities within the Eastern District and elsewhere throughout New York.  *Id.*, Ex. A (Moore Dep.) at 212:11-23.  This is not surprising, as New York is by far one of the most important markets for Lectrosonics, representing in 2017 alone approximately 40% of Lectrosonics's U.S. sales and 27% of its worldwide sales.  *See id.*, Ex. Q. At the conclusion of each audit, New York assessed additional business tax against Lectrosonics. *Id.*, Ex. O (Tax Audit Documents) at LEC000315, 317, 321, 322.

> **B.     Jaycee Communications Inc.**

Customers wishing to repair Lectrosonics products may do so at one of two repair centers in the U.S.: (i) Lectrosonics's New Mexico facility or (ii) Jaycee—a factory authorized repair center operated out of the home of Jerry Cudmore (Oakland Gardens, NY) within the Eastern District.  Mr. Cudmore has operated Jaycee from this location continuously and without interruption for at least the last nine (9) years.  DeMatteo Decl., Ex. R (Cudmore Dep.) at 23:7 to 24:6, 39:10 to 40:16; Ex. S (Jaycee Agreement) at LEC000633, 639; Ex. AA (Lectrosonics Repair Page).  Mr. Cudmore stocks 14,000+ Lectrosonics parts at Jaycee and devotes no less than ninety-eight percent (98%) of his business to the repair of Lectrosonics products.  *Id.*, Ex. X (Jaycee About US FAQ Policies); Ex. R (Cudmore Dep.) at 34:16-23, 36:25 to 37:14.

Jaycee follows factory guidelines and procedures established by Lectrosonics for repair of its products.  Mr. Cudmore received "extensive factory training" from Lectrosonics and has ongoing "access to the full resources of [Lectrosonics's] technical services division." *Id.*, Ex. AB (Jaycee Press Release); Ex. R (Cudmore Dep.) at 23:23 to 24:6, 45:19 to 46:15.  Jaycee's and Lectrosonics's warranty and non-warranty repair policies are worded in a nearly identical manner, and both require obtaining a Lectrosonics "RO" number prior to submitting a repair request.  *Id.*,

Ex. W (Lectro Repair Policy) at 3-4, Ex. Z (Jaycee Repair Policy) at 2-3. Mr. Cudmore is required by contract to repair Lectrosonics products "both in and out of warranty;" "repair products within 3 working days;" "treat Lectrosonics's customers in a professional manner;" "protect and be responsible for customers' equipment;" maintain "a professional, neat repair center to customers;" charge customers in accordance with "Lectrosonics's flat rate fee schedule;" "[f]orward products to [Lectrosonics] if they cannot be repaired within 7 days;" "maintain . . . necessary test equipment and repair parts;" "send invoices once a month" which shall include "part number and serial number of the unit, an understandable description of the failure, parts consumed, hours of labor expended, internal circuit board numbers and revisions, and firmware version if applicable;" and state labor expended "in tenths of an hour increments, billed at a rate of $75.00 per hour." *Id.,* Ex. S (Jaycee Agreement) at LEC000627-628. Jaycee follows Lectrosonics's alignment procedures for "each individual product" and uses "only factory trained technicians and factory approved test and alignment equipment." *Id.*, Ex. R (Cudmore Dep.) at 56:15 to 57:5; Ex. AC (Jaycee News Web Page). Mr. Cudmore's contract with Lectrosonics also requires that "[p]arts consumed . . . be limited to" Lectrosonics's "own part numbers, listed on and priced according to the Company's . . . Price List." *Id.,* Ex. S at LEC000628, 635-636, 641-642.

Lectrosonics's business relies heavily on Mr. Cudmore and Jaycee for provision of repair services to its customers. Jaycee has authority to determine whether repairs are in or out of warranty (presumably binding Lectrosonics in the process), and to charge accordingly. *Id.*, Ex. R (Cudmore Dep.) at 60:16 to 62:6. Lectrosonics also tasks Jaycee to service certain legacy products exclusively and assures customers that the quality of Jaycee's services is commensurate with that of Lectrosonics's factory service. *Id.*, Ex. W (Lectro Repair Policy) at 2. Mr. Cudmore has even manned Lectrosonics's booths at tradeshows with other Lectrosonics personnel. *Id.*, Ex. R

13

(Cudmore Dep.) 63:12 to 64:5.   He also receives weekly instruction from the President of

Lectrosonics, Gordon Moore, regarding customer relations, and attends monthly meetings with

Mr. Kaufman.   *Id.*, Ex. R (Cudmore Dep.) at 18:11-19; Ex. AD (Kaufman-Cudmore Meetings).

Mr. Cudmore also utilizes Jaycee Communications and LectroRepair.com interchangeably to refer

to Jaycee, and he holds himself out as the president of both.   *Id.*, Ex. U (Cudmore LinkedIn); Ex.

Y.   The domain name LectroRepair.com redirects to http://jayceecomms.com/news.htm (titled

"Lectrosonics Page") and displays a Lectrosonics logo, as does Mr. Cudmore's business card. *Id.,*

Ex. V; Ex. T; Ex. Y.   Lectrosonics also paid for expenses associated with Mr. Cudmore's

deposition during jurisdictional discovery. *Id.*, Ex. R (Cudmore Dep.) 15:13-25, 16:2-17.

## III.   ARGUMENT

### A.   Legal Standard

When considering a motion to dismiss for improper venue under Fed. R. Civ. P. 12(b)(3),

a complaint need make out only a "*prima facie* showing" of venue.   *Ginsberg v. Gov't Props.

Trust, Inc.*, 2007 U.S. Dist. LEXIS 75771, at *11 (S.D.N.Y. Oct. 11, 2007).   However, when such

a motion is made after jurisdictional discovery, the *prima facie* showing must be factually

supported, that is, "[it] must include an averment of facts that, if credited by the ultimate trier of

fact, would suffice to establish . . . jurisdiction over the defendant."   *Id*.   So long as such an

averment is made, all disputed issues of fact must be resolved in the plaintiff's favor in the absence

of an evidentiary hearing.   *New Moon Shipping Co., Ltd. v. MAN B&W Diesel AG*, 121 F.3d 24,

29 (2d Cir. 1997) ("[a] disputed fact may be resolved . . . adverse to the plaintiff only after an

evidentiary hearing . . . .") (citations omitted).   "All pleadings and affidavits 'must be construed in

the light most favorable to [the non-movant] and all doubts must be resolved in [its] favor.'"

*TeeVee Toons, Inc. v. Gerhard Schubert GmbH*, 2002 U.S. Dist. LEXIS 5546, at *16 (S.D.N.Y.

Mar. 28, 2002) (citations omitted).

14

28 U.S.C. § 1400(b) controls venue in patent cases.  *See In re Cordis Corp.*, 769 F.2d 733, 736 (Fed. Cir. 1985).  According to the statute, venue in a patent case may be laid "in the judicial district where the defendant resides," *i.e.*, where the defendant is incorporated (*see TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1521 (2017)), or "where the defendant has committed acts of infringement and has a regular and established place of business."  § 1400(b). "In deciding whether a defendant has a regular and established place of business in a district, no precise rule has been laid down and each case depends on its own facts."  *In re Cray Inc.*, 871 F.3d at 1362.  However, the Federal Circuit recently set forth three general requirements in *In re Cray*: "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant."  *Id*. at 1360.

The requirement of a "physical place" does not necessitate a "'fixed physical presence in the sense of a formal office or store.'"  *Id*. at 1362 (quoting *In re Cordis Corp.*, 769 F.2d at 737). All that need be shown is "a physical, geographical location in the district from which the business of the defendant is carried out," such as "'[a] building or part of a building set apart for any purpose' or 'quarters of any kind' . . . ."  *Id*. at 1362-63.  Such a place is "regular and established" under the second requirement, for example, if it operates in a "'steady[,] uniform[,] orderly[, and] methodical' manner that is 'settle[d] certainly, or fix[ed] permanently'"—that is, not temporary or transient.  *Id*. at 1362-63 (citations omitted); *see also In re Cordis Corp.*, 769 F.2d at 737 ("permanent and continuous presence").

The final requirement is that the place be a "place of the defendant" in the sense that the defendant "establish[es] or ratif[ies]" the physical place from which business is conducted.  *In re Cray Inc.*, 871 F.3d at 1363 (citations omitted).  An important consideration is whether the defendant represents to the public that the place of business is defendant's, such as via marketing

and other publications (*id*. at 1363-64), or otherwise "played a part in selecting the place's location" (*id*. at 1365).   A court should compare the place of business in the district to other places of business of the defendant, as such a comparison "may reveal . . . that a defendant has a business model whereby many employees' homes are used as a place of business of the defendant."  *Id*. at 1364.   Also highly relevant is "whether the defendant . . . stored . . . materials[, such as product inventory and literature] at [the] place in the district so that they can be distributed or sold from that place."  *Id*. at 1363; *see also id*. at 1357, 1366; *In re Cordis Corp.*, 769 F.2d at 737.   Other factors relevant to the analysis include (i) whether the defendant offers reimbursement for use of the place of business, such as for use of an employee's home or residence (*In re Cray Inc.*, 871 F.3d at 1365-66); (ii) whether the defendant's business depends on employees being physically present at places in the district (*id*. at 1365); (iii) whether defendant services customers within the district (*id*.); (iv) "whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place" (*id*. at 1363); (v) whether the defendant lists the place of business on a website or in a telephone directory (*id*. at 1363-64); (vi) whether the defendant hires third-party services to assist with operation of the place of business (*In re Cordis Corp.*, 769 F.2d at 735); and (vii) whether a specific portion of a home is set aside for business purposes (*Shelter-Lite, Inc. v. Reeves Bros., Inc.*, 356 F. Supp. 189, 191 n.3 (N.D. Ohio 1973)).

### B.     Venue Is Proper In The Eastern District Under 28 U.S.C. § 1400(b)

Zaxcom's first amended complaint contains at least seventy (74) paragraphs of allegations that make out a *prima facie* showing that venue is proper in the Eastern District.  *See* Dkt. 33 at ¶¶ 3-72; 87, 95-96, and 104.   These allegations are supported by substantial facts gathered during jurisdictional discovery and, as such, must be accepted as true, with all factual disputes being resolved in Zaxcom's favor.   Lectrosonics's motion should therefore be denied.

i.      **Lectrosonics Committed Acts Of Alleged Infringement Within
        The Eastern District**

Substantial evidence gathered during jurisdictional discovery supports allegations in the

first amended complaint that Lectrosonics committed acts of alleged infringement within the

Eastern District, *and Lectrosonics's motion offers no evidence or argument to the contrary*.

The Amended Complaint alleges, *e.g.*, that "Lectrosonics has sold products and committed

infringing acts in this district by offering for sale and selling certain electronic recorders, wireless

transmitters and receivers, audio processors, and related accessories, including its Portable Digital

Audio Recorder ("PDR") and related accessories, through its distribution channels in this district.

. . . Lectrosonics markets and offers the PDR and related accessories for sale in this judicial district

and throughout the United States through Amazon.com ("Amazon") and its online website. . . .

Upon information and belief, Lectrosonics has also sold numerous PDRs to distributors located

within this judicial district." Dkt. 33 at ¶ 4; *see also* Dkt. 33 at ¶¶ 87, 95-96, and 104.

These allegations are supported by facts gathered during jurisdictional discovery. A

manifest of Lectrosonics's product inventory maintained at Mr. Kaufman's residence within the

Eastern District lists the accused PDR. *See* DeMatteo Decl., Ex. F at 2. Messrs. Moore and

Kaufman both testified that this inventory (which includes the PDR) is used, in part, for

demonstrations, which are infringing uses under the patent statutes. *Id.*, Ex. A (Moore Dep.) at

179:20-25; Ex. E (Kaufman Dep.) at 157:6-17; *see Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d

1566, 1573 (Fed. Cir. 1996) ("The patent statute grants the patentee the right to exclude others

from making, using, or selling the patented subject matter."). Further, Gotham Sound and

Communications, Inc. ("Gotham Sound"), an authorized Lectrosonics distributor in Long Island

City within the Eastern District, offers numerous PDRs and related accessories for both rental and

purchase. Sanders Decl. at ¶¶ 2-4. As an authorized independent distributor, Gotham Sound

purchases its product inventory directly from Lectrosonics's headquarters in New Mexico—a fact that was confirmed by Gordon Moore and by a Gotham Sound representative.  DeMatteo Decl., Ex. A (Moore Dep.) at 147:16 to 148:5; Moore Decl. at ¶ 5; Sanders Decl. at ¶ 5.  Sales of these numerous PDRs by Lectrosonics to Gotham within the Eastern District are clearly infringing sales.

### ii.      The Northeast Regional Office And Jaycee Are Physical, Regular And Established Places of Business

Lectrosonics's northeast regional office and Jaycee meet the first two venue requirements set forth in *In re Cray* (*i.e.*, they are "physical places" and "regular and established" places of business).  The northeast regional office is operated from a specific portion of Mr. Kaufman's residence and, as such, constitutes "a physical, geographical location in the district from which the business of the defendant is carried out," as required by *In re Cray*.  *See* DeMatteo Decl., at Ex. A (Moore Dep.) at 184:22 to 185:2; Ex. E (Kaufman Dep.) at 104:2 to 106:10, 109:21 to 112:9, 135:23 to 136:11.  The area includes a dedicated room and storage area, within which are kept various equipment used by Mr. Kaufman to discharge his responsibilities.  *Id*.  This location is also "regular and established," as it has been operated permanently on behalf of Lectrosonics continuously, methodically and without interruption for the last 20+ years.  *Id.*, at Ex. A (Moore Dep.) at 141:10-14, 144:18-25, 167:25 to 168:25; Ex. D at LEC000469; Ex. E (Kaufman Dep.) at 103:16 to 104:5.  Likewise, Jaycee is situated at a physical location within the Eastern District (*i.e.*, Oakland Gardens, NY) and has been there permanently and continuously for more than nine (9) years servicing Lectrosonics's customers from New York and elsewhere.  *Id*., Ex. R (Cudmore Dep.) at 23:7 to 24:6, 39:10 to 40:16; Ex. S (Jaycee Agreement) at LEC000633, 639; Ex. AA (Lectrosonics Repair Page).  Lectrosonics's opening brief does not contest these facts or provide any evidence or argument concerning the "physical place" and "regular and established" venue requirements.  The first two venue requirements of *In re Cray* are thus met.

### iii.   The Northeast Regional Office Is A Place of Business of Lectrosonics

The northeast regional office meets the third venue requirement of *In re Cray* because it is a place of business of Lectrosonics.  Lectrosonics forbids operation of brick-and-mortar offices from its various sales territories, instead encouraging, if not requiring, its managers to use their homes as regional offices.  Indeed, the fact that Lectrosonics advertises regional manager positions as permanent "home office" positions with "home office allowance" benefits is all but dispositive of this issue.[4]  DeMatteo Decl., Ex. C; *see also id.*, Ex. A (Moore Dep.) at 78:22-25, 165:10-23; Ex. D at LEC000468; Ex. E (Kaufman Dep.) at 141:2-7.  Lectrosonics also offers reimbursement for certain business equipment and services (such as computers, printers, furniture, land-line Internet services, etc.), *none of which—given Lectrosonics's ban on brick-and-mortar sites—could be utilized reasonably from any location other than a home office*.  Even Mr. Kaufman testified that, at the time of his hiring in 1996, he understood that Lectrosonics business was to be performed from his home—a fact that provides further evidence of a plan by Lectrosonics to utilize the homes of its regional managers for business.  *Id.*, Ex. E (Kaufman Dep.) at 140:25 to 141:7.

Lectrosonics also plays a substantial role in selecting the location of regional offices. While Lectrosonics does not require offices to operate from specific addresses, it does require managers to operate them from within their assigned territories and forbids them from moving to locations where they cannot perform tasks or meet with customers in-person.  *Id.*, Ex. C (job posting requiring "home office" to be "in the territory"); Ex. A (Moore Dep.) at 69:24 to 70:2; 155:21 to 156:8; 157:20-23; 161:22 to 162:7.  Indeed, the record is devoid of *any* evidence that *any* U.S. manager working outside New Mexico lived outside his/her assigned territory at *any*

---

[4] Whether Mr. Kaufman received such an allowance is irrelevant, as the mere offer of such compensation more than establishes a plan by Lectrosonics to use managers' homes for business.

time.  Mr. Kaufman, in particular, resides in the northeast territory right outside New York City—the most crucial area for sales within his region.  *Id*. at Ex. A (Moore Dep.)  at 156:9 to 157:19.

Other considerations establish the northeast office as a place of business of the company.  For instance, Lectrosonics's storage of approximately 100 "finished goods" at its northeast office and use of these products for demonstrations, product swaps and sales—facts which Lectrosonics does not deny—highlights the importance of the northeast office and its close relationship to Lectrosonics.  *Id*., Ex. F; Ex. A (Moore Dep.) at 182:9 to 183:5, 187:3-25, 197:23 to 198:3; Ex. E (Kaufman Dep.) at 157:6 to 159:8, 159:13-160:3.  This close relationship is further evidenced by the company's numerous representations that its regional offices are official offices of Lectrosonics, including (i) public statements by Lectrosonics's Vice President of Sales, Karl Winkler, characterizing the northeast regional office as "*our* NY office," (ii) public statements from Mr. Kaufman himself that Lectrosonics has a New York office and (iii) numerous apparent statements to unrelated publications over the past 14 years which, in articles written about the company, *have uniformly and consistently identified locations where regional managers reside as "offices" of Lectrosonics*.  *Id*., Ex. A (Moore Dep.) at 133:19 to 134:9; Ex. G at LEC000466; Ex. H at LEC000464; Ex. I; Ex. J at LEC000453.  The uniformity of these representations over such a long span of time is striking and leads to only one reasonable conclusion (which Mr. Moore could not deny when questioned)—*i.e.*, Lectrosonics personnel routinely represent to publications researching the company that it operates offices where its regional managers live.

The sheer breadth of Mr. Kaufman's responsibilities establishes the vital importance of the northeast office and its close relationship to Lectrosonics.  Lectrosonics relies heavily on its regional office in the Eastern District as a hub from which to conduct substantial business and extend its goodwill throughout the northeastern territory of the United States.  Mr. Kaufman does

far more than merely "visit[] and communicate[] with . . . dealers . . . to provide technical information," as suggested by Lectrosonics. *See* Mot. at 8. By his own admission, Mr. Kaufman conducts a "great variety" of Lectrosonics business from the northeast regional office, including sales solicitation, technical support, product instruction, product demonstrations, sponsorship activities, customer liaison activities, product installation support, customer system design, and product returns, to name a few. Whether Mr. Kaufman spends most of his time on the road does not change the character of the northeast office as an official office of Lectrosonics. *See Brunswick Corp. v. Suzuki Motor Co.*, 575 F. Supp. 1412, 1424 (E.D. Wis. 1983) ("venue may be satisfied even though [the] salesman spends virtually all his time on the road calling on customers.").

It is of no moment that the northeast regional office is operated out of Mr. Kaufman's home. *See* Mot. at 6-8. The Federal Circuit in *In re Cray* made clear that an employee's home may constitute a "regular and established place of business." *See In re Cray Inc.*, 871 F.3d at 1357, 1363-65. Numerous courts have found similarly. *See, e.g., Mallinckrodt IP v. B. Braun Med. Inc.*, 2017 U.S. Dist. LEXIS 205593, at *9 (D. Del. Dec. 14, 2017) ("a defendant's employee's home may, in some circumstances, constitute a 'place of the defendant.'") (citations omitted); *accord 3M v. Johnson & Johnson Prods.*, 1986 U.S. Dist. LEXIS 15763, at *14 (D. Minn. 1987) (denying motion to dismiss under § 1400(b) based on activities of representatives operating from their homes); *Brunswick Corp.*, 575 F. Supp. at 1424 ("This court does not lack venue over U.S. Suzuki . . . . Its employees are here. They own or rent homes here, and they essentially work out of their homes."); *CPG Prods. Corp. v. Mego Corp.*, 1980 U.S. Dist. LEXIS 17061, at *11-12 (S.D. Ohio 1980) (finding venue proper based on activities of a single sales agent operating from his home); *Instrumentation Specialties Co. v. Water Associates, Inc.*, 1977 U.S. Dist. LEXIS 13508, at *16 (N.D. Ill. 1977) (finding venue proper under § 1400(b) based on sales operations out of employees'

21

homes); *Shelter-Lite, Inc.*, 356 F. Supp. at 195 ("an unyielding rule that a regular and established place of business cannot arise by virtue of a salesman operating out of his residence is at odds with the practicalities and necessities of the business community.").

Cases cited by Lectrosonics are distinguishable on numerous grounds. *See* Mot. at 14-15. For instance, in *W. S. Tyler Co. v. Ludlow-Saylor Wire Co.*, an employee, who worked for two employers (sharing expenses) merely solicited orders for the defendant from a rented room. 236 U.S. 723, 725 (1915). He was not a full-time employee with vast responsibilities (like Mr. Kaufman), nor is there anything suggesting he stored and distributed inventory, visited customers in the district, or that the defendant encouraged use of the rented room or held it out as a place of business. Similarly, in *General Radio Co. v. Superior Elec. Co.*, the employee did nothing more than solicit sales and consult with customers from a small office. 293 F.2d 949 (1st Cir. 1961).

Other cases cited by Lectrosonics are distinguishable on similar grounds, as none comes even close to demonstrating the level of persistent, ratified, and pervasive business activities engaged in by Lectrosonics from a place of business within the Eastern District. *See, e.g., Cordis Corp. v. Cardiac Pacemakers*, 599 F.2d 1085 (1st Cir. 1979) (no inventory at office; no evidence of sales of accused product in state; independent contractor, not employee; no representation that resident's home was office of defendant; no encouragement of use of home as office); *Univ. of Ill. Found. v. Channel Master Corp.*, 382 F.2d 514 (7th Cir. 1967) (no space set aside for business use; no evidence company represented employee's home as defendant's; no inventory at office; no demonstration of products; no evidence of compensation linked to home); *Endrezze v. Dorr Co.*, 97 F.2d 46 (9th Cir. 1938) (no inventory at office; employees only solicited business and furnished information; no evidence company represented office as its own; no evidence of infringement in district); *Johnston v. IVAC Corp.*, 681 F. Supp. 959 (D. Mass. 1987) (no inventory

22

to fill orders directly; employee did not set aside portion of home for business; no offer of compensation linked to home, no evidence company represented home as its own office); *Railex Corp. v. White Mach. Co.*, 243 F. Supp. 381 (E.D.N.Y. 1965) (no inventory at office; no offer of compensation linked to home; no reimbursement for car and other expenses; employee did not spend working day at home; no evidence that portion of home set aside for business; no evidence that company represented home as official office); *Brevel Products Corp. v. H & B American Corp.*, 202 F. Supp. 824 (S.D.N.Y. 1962) (independent contractor, not employee; employee of multiple employers in same office; no representation that office was that of defendant).

### iv.    Jaycee Is A Place of Business of Lectrosonics

Jaycee is also a place of business of Lectrosonics because it is an agent of the company. To establish a principal/agent relationship, a party must demonstrate: "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking." *Nuevo Mundo Holdings v. PriceWaterhouseCoopers LLP*, 2004 U.S. Dist. LEXIS 780, at *13 (S.D.N.Y. Jan. 22, 2004). "Actual agency is created by 'written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.'" *Id.* (citations omitted).

The written agreement between Lectrosonics and Jaycee, as well as other conduct between these entities, creates an agency relationship for provision of repair services. *See* DeMatteo Decl.*, Ex. S (Jaycee Agreement). The agreement establishes a manifestation by Lectrosonics that Jaycee shall act for it as an "authorized Warranty Repair Station" and that Jaycee "accepts appointment" as such. *See Id.,* Ex. at LEC000627. The substantial business constraints placed on Jaycee (including constraints related to price, warranty, parts, manner of business, reporting, invoicing, etc.) establish that Lectrosonics controls the manner by which Jaycee performs repair services,

23

going so far as to ensure that the quality of repairs and customer experience match those provided by Lectrosonics itself.   Whether Jaycee has "latitude" to deviate from its contractual responsibilities with Lectrosonics's permission (*see* Mot. at 10) is irrelevant and does not diminish in any way Lectrosonics's *right* to control how repairs are effectuated.

Whether Jaycee is a separate company is irrelevant.   *See* Mot. at 17.   New York courts routinely find principal-agent relationships between independent companies, so long as the requisite control exists.   *See, e.g., Jenkins v. Nat'l Grid USA*, 2017 U.S. Dist. LEXIS 49365, at *22-23 (E.D.N.Y. Mar. 31, 2017)*; In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 451-52 (S.D.N.Y. 2009); *In re Tronox, Inc. Secs. Litig.*, 769 F. Supp. 2d 202, 216 (S.D.N.Y. 2011).   This is true even where the contract establishing the relationship indicates that the servicing company is an "independent contractor."   *See, e.g., Jenkins*, 2017 U.S. Dist LEXIS 49365, at *22-23.   With respect to patent venue in particular, courts have held that actions of an agent may confer venue, even when the agent holds itself out as an independent entity.   *See, e.g., Sherman Paper Products Corp. v. Sorg Paper Co.*, 161 F. Supp. 44, 45 (E.D. Mich. 1958) (finding venue proper based on actions of independent distributor, noting that "[t]echnical distinctions should not obscure the practical effects of corporate activity."); *see also In re Cray Inc.*, 871 F.3d at 1361 (recognizing that the purpose of § 1400(b)'s predecessor statute was to 'give original jurisdiction to the court where a permanent agency transacting the business is located.'"); *Thomson-Houston Electric Co. v. Bullock Electric Co.*, 101 F. 587, 588-89 (Cir. Ct. N.Y. 1900) (finding venue proper based on actions of independent sales agent); *Chadeloid Chemical Co. v. Chicago Wood Finishing Co.*, 180 F. 770, 771 (Cir. Ct. N.Y. 1910) ("In the face of their own advertisements, and of the representations they allowed Olmstead to make, that he was their Eastern agent, they cannot . . . now deny that they had any business in the East at all . . . .").   The same result should obtain here.

Cases cited by Lectrosonics are distinguishable.  *See* Mot. at 17-18.  In *Knapp-Monarch Co. v. Casco Prods. Corp.*, 342 F.2d 622, 625 (7th Cir. 1965), the businesses were "independently operated," and the opinion is devoid of facts related to the control of the business by the defendant. In contrast, Jaycee is subject to a great deal of control, contractually in writing and by other conduct, right down to the wording of its warranty policy. *Id.*, Ex. W (Lectro Repair Policy) at 3-4, Ex. Z (Jaycee Repair Policy) at 2-3.  Similarly, in *Stewart-Warner Corp. v. Hunter Engineering Co.*, 1969 U.S. Dist. LEXIS 10553, at *7 (N.D. Ill. Jul. 3, 1969), "the only control which is directly maintained by Hunter over the franchised distributors is on the credit which is extended to them." These facts vary greatly from those of the present case.

**IV.    CONCLUSION**

For the foregoing reasons, it is respectfully requested that the Court deny Lectrosonics's Motion to Dismiss for Improper Venue, or in the Alternative, to Transfer the Case to New Mexico.

Dated: February 13, 2018               Respectfully submitted,

                                       DEMATTEO LAW, PLLC

                                       _____
                                       Bryan N. DeMatteo (BD 3557)
                                       bryan@demfirm.com
                                       830 Third Avenue, 5th Floor
                                       New York, NY 10022
                                       Tel.: (866) 645-4169

                                            -and-

                                       Rita C. Chipperson, Esq.
                                       rcc@chippersonlaw.com
                                       CHIPPERSON LAW GROUP, P.C.
                                       163 Madison Avenue, Suite 220-40
                                       Morristown, NJ 07960
                                       Tel: (973) 845-9071
                                       *Attorneys for Plaintiff*
                                       *Zaxcom, Inc.*